**NOT FOR PUBLICATION**                                          **CLOSED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                                :
BERNADETTE M. FAGANS,                           :
                                                :
              Plaintiff,                        :            Civil Action No. 08-5775 (JAP)
                                                :
       v.                                       :            **OPINION**
                                                :
MICHAEL J. ASTRUE, COMMISSIONER :
OF SOCIAL SECURITY,                             :
                                                :
              Defendants.                       :
_____:

PISANO, District Judge.

       Before this Court is the appeal of Bernadette M. Fagans ("Claimant") from the final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her request for disability insurance benefits under the Social Security Act.  The Court has

jurisdiction to review this matter under 42 U.S.C. § 405(g).  The Court decides this matter

without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth

herein, the Court finds that the record provides substantial evidence supporting the

Administrative Law Judge's ("ALJ") decision that Claimant is not disabled.  Accordingly, this

Court affirms the Commissioner's decision.

       **I.      BACKGROUND**

       Claimant was born on August 16, 1951.  (Administrative Record ("R.") 676).  She has a

high school education.  (R. 676).  From 1977 to 1995, Claimant worked on the assembly line

racking parts at General Motors.  (R. 677).   Claimant stopped working in 1995 after

experiencing pain and swelling in her hands.  (R. 680).  She asserts that she became disabled on July 15, 1997.  (R. 17).

### A.  **Procedural History**

Claimant filed an application for disability insurance benefits on February 19, 2003 alleging a disability onset date of February 21, 1996.  (R. 100-102).  The Social Security Administration denied Claimant's claims both initially and upon reconsideration.  (R. 48-52, 55-57).  Subsequently, Claimant filed a Request for an Administrative Hearing.  (R. 58-59).  On January 11, 2005, a hearing was held before United State Administrative Law Judge Daniel N. Shellhamer.  (R. 629).  On August 9, 2005, the ALJ issued a decision denying Claimant's claim.  (R. 34-35).  Thereafter, on August 12, 2005, Claimant filed a Request for Review by the Appeals Council.  (R. 78-79).  The Appeals Council remanded the case back to the ALJ on November 3, 2005.  (R. 80-82).  On August 17, 2006, a Remand Hearing was held before Judge Shellhamer whereby Claimant agreed to amend her alleged onset date of July 15, 1997 (the day following the adverse decision on a prior Title II claim).  (R. 668-720).  The ALJ issued a decision denial on October 16, 2006.  (R. 458-476).  Thereafter, Clamant filed a Request for Review by the Appeals Council on October 30, 2006.  (R. 473-474).

On March 23, 2007, the Appeals Council remanded the case back to an ALJ.  (R. 480-483).  On July 25, 2007, another Remand Hearing was held before ALJ Daniel W. Shoemaker. The ALJ issued a decision denial on September 5, 2007.  (R. 13-36).  On September 14, 2007, Claimant filed a request for review by the Appeals Council.  (R. 11-12).  The Appeals Council issued a denial decision on October 17, 2008.  (R. 5-8).  Thereafter, on November 25, 2008, Claimant filed this action in the United States District Court for the State of New Jersey for review of the Commissioner's determination.

2

### B.  Factual History

#### 1.   Claimant's Previous Employment

Claimant spent over twenty years as an assembly line worker racking varying parts using either tongs or one or both hands.  (R. 677-679).   Claimant explained that the job demanded she stand for about eight hours a day minus breaks and required her to lift up to twenty-five pounds. (R. 678).  Due to the repetitive labor, Claimant testified that in 1995 she began experiencing pain and swelling in her hands.  (R. 680).  During these times, Claimant was put on light duty inspecting pieces for a short period of time.  (R. 680).  These light duty inspections jobs, however, were not permanent positions and were created for Claimant only while she was receiving treatment.  (R. 683).  Though other workers held inspection jobs, Claimant testified that she was unable to perform the demands of their jobs because she could not inspect the number of pieces required per hour or retrieve and carry trays weighing fifteen pounds from the truck.  (R. 684-685).

#### 2.  Claimant's Daily Activities

Claimant testified that after her hand surgeries forced her to leave her job she had regular difficulty performing daily tasks.  (R. 687).  Specifically, Claimant noted difficulties in brushing her hair, doing dishes, and writing out bills. (R. 687).   In order to make herself presentable, Claimant has to get up early and must go to a hairdresser because she cannot do her own hair. (R. 703, 775).  She also must be driven around by her husband because she has trouble driving.  (R. 703, 775).  Prior to her Workmen's Compensation settlement, Claimant testified that she had difficulty getting dressed, preparing meals, and loading the dishwasher. (R. 696-701).  Claimant struggled to open jars and could only attempt to open doorknobs with both hands.  (R. 701). Claimant testified that these daily activities would cause pain in her hand and require her to take

breaks to alleviate the pain.   (R. 687-688).  Specifically, Claimant noted that she could engage in an activity for at most five minutes and then would need to take a fifteen minute break which would still not dull the pain.  (R. 698-699).   Additionally, Claimant testified that the aches and pains in her hands and feet intensified to the point of interfering with her nightly sleep.  (R. 706).

### 3.  Medical History

#### a.  *Claimant's Testimony*

Claimant's chief complaint is pain and swelling in her hands.  (R. 680, 686).  Claimant has had her right hand at the base of her thumb operated on three times to rebuild and fuse the joint.  (R. 686).  Additionally, Claimant complained of depression, anxiety attacks, and unregulated blood pressure.  (R. 645).  Claimant testified that starting in 1996 she began to have anxiety attacks where she didn't know how to deal with large groups of people, got scared, and couldn't swallow.  (R. 646).  Claimant testified that in 1998 she was rushed to the hospital a couple of times due to chest pains and was later diagnosed with anxiety.  (R. 646).  Further, after her first surgery, Claimant became depressed as she was frustrated with life and felt worthless. (R. 647).  Claimant reported that she has trouble concentrating and focusing her attention on one thing.  (R. 647).  Claimant stated that she felt like a robot going through life not talking to anyone, having no interests, and feeling useless.  (R. 649).  From 1998 to 2001, Claimant testified that her primary physician treated her for depression, anxiety attacks, and blood pressure and that she has been taking medication for anxiety and depression since 1990 or 1996.  (R. 645, 658).  Additionally, in 1993, Claimant noted that she had X-rays of her lower back and neck due to pain which caused tingling in her feet and disrupted her sleep.  (R. 649).

**b.  *Medical Evidence of Claimant's Physical Impairments Considered by ALJ***

**1.  Dr. Stackhouse**

On September 4, 1990, Dr. Thomas Stackhouse performed resection arthroplasty on Claimant's right thumb.  (R. 154-155).  During follow-up visits in August 1996, Dr. Stackhouse noted that Claimant continued to have pain in her right hand.  (R. 182-183).

**2.  Dr. Fletcher**

On September 9, 1997, Dr. Fletcher performed a right thumb basal joint arthroplasty revision on Claimant.  (R. 374).  On September 22, 1997, Dr. Fletcher performed a post-operation two week check-up on Claimant and noted that she no longer required pain medication.  (R. 197).  On December 17, 1997, Dr. Fletcher reported that three months after the operation Claimant was significantly relieved of the majority of her thumb pain.  (R. 195).  On April 4, 1998, Dr. Fletcher noted that she was satisfied with her post-operative improvement and authorized Claimant to return to work on a limited capacity without repetitive gripping or grasping, writing, or lifting greater than five pounds with her right hand.  (R. 192).

**3.  Dr. Weiss**

On November 16, 1998, Dr. Weiss noted that Claimant's right hand was at a 72.5 percent impairment.  (R. 437).  On February 26, 2002, Dr. Weiss noted that Claimant's right hand was at an eighty-five percent impairment.  (R. 214).  On April 10, 2003, Dr. Weiss reported that Claimant's left thumb carpometacarpal joint derivative injury was at twenty-five percent impairment.  (R. 402).

**4.  Dr. Rubin**

On October 1, 1998, Dr. Rubin reported that Claimant's neuropsychiatric impairment was at forty-five percent.  (R. 416).

### 5. Dr. Mangiaricina

On December 8, 2003, Dr. Mangiaricina performed a clinical evaluation of Claimant and concluded that Claimant can never lift up to five pounds, can only sit for two hours a day, can only stand and walk for one hour a day and cannot use either of her hands for repetitive grasping, pushing, or pulling.  (R. 302).  Dr. Mangiaricina also provided all her written notes from Claimant's visits starting from February 1993.  (R. 307-351).  Dr. Mangiaricina recorded Claimant's sixteen examinations from January 1996 to October 1998 and only reported anxiety on one visit in June 1996.  (R. 318-326).  Following this time period, the prevalence of anxiety is noted in November and December of 1998.  (R. 327-328).

### 6. Dr. Levy

On August 28, 1996, Dr. Levy, at the request of Dr. Stackhouse, performed an electromyopgraphy (EMG) on both of Claimant's upper extremities.  (R. 179).  The EMG results indicated that Claimant had no carpal tunnel syndrome or any other nerve entrapment at the wrist, elbow, or brachial plexus or any cervical radiculopathy.  (R. 179).

### 7. Dr. Branon

On January 28, 1996, Dr. Branon reported that Claimant did not have any anatomical esophageal obstruction and was certain her hospitalization for an esophageal spasm was due to a panic attack.  (R. 384).  Dr. Branon prescribed for Claimant a one month prescription for Xanax. (R. 384).

### 8. Dr. Zawawi

On September 23, 1994, Dr. Zawawi diagnosed Claimant with a generalized anxiety disorder.  (R. 427).  Dr. Zawawi reported that Claimant described her mood as depressed with a loss of interest, anxious, and apprehensive.  (R. 427).

**9. Dr. Gooriah**

In May 2003, Dr. Gooriah examined Claimant and diagnosed her with a depressive disorder, secondary to a general medical condition. (R. 240). In her report, Dr. Gooriah noted that Claimant described her mood as irritable, but Claimant demonstrated a good attention span and concentration. (R. 240).

## II. LEGAL STANDARD FOR DISABILITY BENEFITS

Claimant's eligibility for disability insurance benefits is governed by 42 U.S.C. § 423. A Claimant is eligible for disability insurance benefits if she meets the disability period requirements of 42 U.S.C. § 416(I), and demonstrates that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A person is disabled for these purposes if his physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a Claimant is disabled. 20 C.F.R. § 404.1520. For the first two steps, the Claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). The Claimant bears the burden of establishing these first two requirements, and the failure to meet this burden automatically results in a denial of benefits. *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

7

If the Claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("listings").  20 C.F.R. § 404.1520(d).  If Claimant's impairment or combination of impairments meets or equals a listed impairment, he is presumed to be disabled and is automatically entitled to disability benefits.  *Id.*  If he cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the Claimant's "residual functional capacity" sufficiently permits him to resume his previous employment.  20 C.F.R. § 404.1520(e).  "Residual functional capacity" is defined as that which an individual is still able to do despite limitations caused by his or her impairments.  20 C.F.R. § 404.1520(e).  If the Claimant is found to be capable of returning to his previous line of work, then he is not "disabled" and not entitled to disability benefits.  20 C.F.R. § 404.1520(e).  Should the Claimant be unable to return to his previous work, the analysis proceeds to step five.  To determine the physical exertion requirements of work, jobs are classified as sedentary, light, medium, heavy, and very heavy.

At step five, the burden shifts to the Commissioner to demonstrate that the Claimant can perform other substantial gainful work.  20 C.F.R. § 404.1520(f).  If the Commissioner cannot satisfy this burden, the Claimant shall receive social security benefits.  *Yuckert*, 482 U.S. at 146-47 n.5.

## III.  STANDARD OF REIVEW

The standard under which the District Court reviews an ALJ decision is whether there is substantial evidence in the record to support the ALJ's decision.  42 U.S.C. § 405(g); *see Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  "[M]ore than a mere scintilla," substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).  The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Substantial evidence, therefore, may be slightly less than a preponderance.  *Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

The reviewing court, however, does have a duty to review the evidence in its totality.  *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).  As such, "a court must take into account whatever in the record fairly detracts from its weight." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal quotations omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987).

"Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (internal quotations omitted).  Nonetheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).

IV.     DISCUSSION

   a.  **The ALJ's Decision**

In his decision (R. 13-36), the ALJ properly applied the requisite sequential evaluation

procedure to determine whether a Claimant is disabled and considered all relevant evidence put

before him.  The decision includes evaluation of Claimant's subjective complaints as well as the

objective medical findings related to her condition.

At step one of the sequential evaluation process, the ALJ determined that the Claimant

had not engaged in substantial gainful activity during the time period of July 15, 1997 (the day

following the adverse decision on prior Title II claim) and continuing through June 30, 1999 (the

date last insured) because her monthly earnings for those years were below the threshold

reflective of substantial gainful activity.  (R. 19-20).  Satisfying step one, the ALJ moved on to

step two concluding that the evidence established the existence of a severe impairment identified

as right hand degenerative joint disease.  (R. 20).   The ALJ found that Claimant's right hand

degenerative joint disease causes "significant exertional and non-exertional limitations in the

claimant's ability to perform basic work activities."  (R. 20).  In his review, the ALJ, however,

found that Claimant's adjustment disorder only caused minimal limitations on her ability to

perform basic mental work activities and therefore was found to be a non-severe impairment.

(R. 20).  The ALJ reached this conclusion based on the lack of objective medical evidence

documenting any mental or emotional impairment on or before June 30, 1999.  (R. 20).  The ALJ

noted that on October 1, 1998 Claimant had a single examination by Dr. Rubin were he

diagnosed her with an adjustment disorder with mixed emotional features and a neuropsychiatric

impairment of forty-five percent.  (R. 20).   In March 1992, Dr. Rubin had performed an

examination on Claimant and found that her total impairment was at thirty-three percent.  (R.

20).  Considering this evidence, the ALJ "assigned little or no weight to Dr. Rubin's estimate of the claimant's psychiatric disability as it was based on only two examinations that occurred six years apart, appeared to be based primarily upon the claimant's subjective complaints, and is not consistent with the objective evidence of record."  (R. 20).  Therefore, the ALJ did not find Claimant's adjustment disorder to be a severe impairment.

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (R. 20).  In reaching this conclusion, the ALJ analyzed the impairments list in both Section 1.00 for the musculoskeletal system and in Section 12.00 for mental disorders.  (R. 20).  In accordance with the standard defined in section 1.00B2c, the ALJ found that there was not adequate evidence presented of limitation of *both* upper extremities during the time period at issue and the inability to perform fine and gross movement was not documented. (R. 21).  Additionally, the ALJ found that Claimant's adjustment disorder did not qualify under the standard in section 12.04 which requires that Claimant's mental condition result in at least two of the following:  "'marked' restrictions of activities of daily living; 'marked' difficulties in maintaining social functioning; 'marked' difficulties in maintaining concentration, persistence or pace, or 'repeated' episodes of decompensation, each of extended duration."  (R. 21).  In finding that the Claimant's impairment did not reach the standard of section 12.04, the ALJ noted that

> during the time period at issue, the severity of the claimant's mental disorder had not resulted in functional limitations which met any of the above criteria; i.e., it had not interfered seriously with her ability to function independently, appropriately, effectively and on a sustained basis.  Specifically . . . the claimant had, at most, "mild" restriction of activities of daily living; "mild" difficulties in maintaining social functioning; "mild" difficulties in concentration, persistence or pace; and "no" episodes of decompensation of extended duration.

(R. 22).  The ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the criteria of listed impairments.  (R. 22).

At step four, the ALJ determined that Claimant had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, and to stand or walk for six hours and to sit for six hours.  (R. 22).  However, the ALJ concluded that Claimant could not perform repetitive or prolonged pushing or pulling with her right upper extremity, use her right thumb for repetitive handling and fingering, and had postural restrictions limiting her to no more than frequent balancing, kneeling, crouching, stooping, and climbing of ramps or stairs, only occasionally crawling, and precluded her from climbing ladders, ropes, or scaffolds.  (R. 22).  Further, the ALJ found that Claimant had an environmental limitation that restricted her from concentrated exposure of the right hand to vibrations.  (R. 22).  Finally, the ALJ noted that Claimant could not tolerate unusual or high stress situations.  (R. 22).

In reaching his conclusion, the ALJ considered all symptoms and the extent to which such symptoms are reasonably consistent with the objective medical evidence and other evidence presented.  (R. 23).   The ALJ assigned significant weight to the reports of the treating physician, Dr. Fletcher, which were consistent with the objective evidence of the record and indicated that Claimant was capable of substantial gainful activity during the time period at issue.  (R. 25).  The ALJ reasonably concluded from Dr. Fletcher's report that although Claimant could not lift more than five pounds with her right hand, she could perform bilateral lifting and carrying at a light exertional level because no limitation of her left hand was identified.  (R. 25).  Additionally, the ALJ concluded that the "diagnostic evidence of record appears to be inconsistent with the severity of the

claimant's complaints and would not preclude substantial gainful activity" because the EMG performed in July 1998 indicated only a mild and chronic impression of bilateral L4 radiculopathy and no indication of peripheral nerve entrapment or myopathy. (R. 25). Further, the ALJ took into consideration the report of Dr. Weiss in November 1998 which acknowledged that Claimant's right hand impairment had increased to over seventy-two percent. (R. 25-26). The ALJ also found other inconsistencies between the physician's reports and Claimants disability claims during a May 2002 check-up where Dr. Fletcher noted that Claimant reported significant improvement in her left thumb and that the difficulties with her right thumb had become tolerable. (R. 26). Such findings were consistent with the ALJ's conclusion that Claimant had a severe impairment in her right hand and although she may not have been able to perform her past relevant work was capable of substantial gainful activity. (R. 25-26).

Additionally, the ALJ gave little weight to the reports of Dr. Mangiaricina from April 2003 to February 2004 that indicated that Claimant was unable to perform either the physical or mental activities to engage in substantial gainful activity. (R. 26). The ALJ found that there was no "indication in either Dr. Mangiaricina's December 8, 2003 statement or opinion regarding her abilities to perform physical or mental work-related activities which indicates that these assessments were not meant to reflect her capabilities as of the date they were completed or that they applied to the time period beginning on or prior to June 30, 1999." (R. 26). Additionally, the ALJ found Dr. Weiss's February 26, 2002 reports to be insufficient evidence of a disability during the relevant time period because the report was dated two and half years after the expiration of Claimant's insured status. (R. 27).

The ALJ also found that the evidence suggests that Claimant exaggerated her condition.  (R. 28).  After reviewing the Claimant's testimony, the ALJ concluded that the "functional limitations alleged do not seem credible because the testimony seemed vague, appeared exaggerated considering the objective medical findings of record, and was inconsistent with the much higher level of daily activities indicated during the time period at issue."  (R. 28).  The ALJ supported this conclusion with fact that only two weeks after her operation in September 1997 Claimant no longer needed pain mediation and that Dr. Fletcher noted that Claimant was relieved of the majority of her thumb pain in December of 1997.  (R. 28).  Additionally, the ALJ relied on the medical reports and tests of Dr. Stackhouse, Dr. McGuigan, Dr. Levy and Dr. Carabelli which showed that her impairment did not preclude all substantial gainful activity.  (R. 28).

The ALJ concluded that Claimant could not return to her prior relevant work as a motor vehicle assembler.  (R. 29).  However, based on the testimony of the vocational expert in step five of the analysis, the information contained in the Dictionary of Occupational Titles, and considering Claimant's age, work experience, skill and residual functional capacity, the ALJ found that Claimant through the date last insured was capable of performing light or sedentary work such as a protective clothing issuer, counter clerk, call out operator or a surveillance system monitor.  (R. 30).  Because Claimant was cable of performing a narrow range of jobs considering her limitations, the ALJ found that Claimant was not under a disability at any time from July 15, 1997 through June 30, 1999.

b.  **Claimant's Arguments**

1.  Challenge to Step One: ALJ's Failure to Obtain a Medical Expert

Claimant argues that the ALJ should have obtained a medical expert per SSR 83-20 to determine the onset date of Claimant's disability.  For onset dates in disabilities with non-traumatic origin, SSR 83-20 provides that the starting point for determining disability is the individual's statement as to when the disability began.  The Regulation directs that the day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date.  SSR 83-20.

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date the impairment became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are in the past and adequate medical records are not available.  In such cases it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

SSR 83-20.  The Regulation instructs that the date alleged by the individual should be used if it is consistent with all evidence available.  SSR 83-20.

In this instance, the ALJ was not required to seek a medical expert in order to determine the onset date of the disability because it was clearly established in the record. SSR 83-20 instructs the ALJ to give deference to Claimant's alleged onset date if it is consistent with the record.  Here, Claimant initially alleged an onset date of February 21, 1996 which was the last date she worked for her employer.  (R. 100).  This date was later amended to July 15, 2007 because the Commissioner had issued an adverse decision on a previous Title II application which found no disability through July 14, 1997.  (R. 674). The record provides ample and clear medical evidence to support both dates supplied by the Claimant despite her arguments that the evidence is "vague" and spread over too

many years.  Further, the ALJ properly considered the July 15, 2007 onset date because the disability had already been adjudicated for the time period up to July 14, 2007.  As such, the ALJ was in compliance with SSR 83-20 and no medical expert testimony was necessary.

### 2.   Challenge to Step Two: ALJ's Evaluation of Psychiatric Impairments

Claimant argues that the ALJ erred in finding that Claimant does not have a severe psychological impairment.   A severe impairment is one that significantly limits an individual's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  In this case, the ALJ concluded that Claimant's adjustment disorder does not cause more than a minimal limitation on her ability to perform basic mental work.  (R. 20).  To support this conclusion that her impairment was non-severe, the ALJ noted that there was no objective medical evidence documenting a mental or emotional impairment before June 30, 1999, except for Dr. Rubin's examination.

In October 1998, Dr. Rubin diagnosed Claimant with an adjustment disorder and rated her neuropsychiatric impairment at forty-five percent.  (R. 20).  Dr. Rubin also noted that Claimant had never been to a psychologist or psychiatrist and described her behavior as "alert and cooperative."  (R. 20).  In March 1992, Dr. Rubin had previously rated Claimant's neuropsychiatric impairment at thirty-three percent.  (R. 20).  Considering this evidence, the ALJ concluded that while a diagnosis of an adjustment disorder existed little weight should be given to Dr. Rubin's report because there were only two examinations which occurred six years apart, were based primarily on Claimant's subjective complaints and were not consistent with other evidence in the record.  (R. 20).  Specifically, the ALJ noted that there was no indication in the reports of Dr. Fletcher of any functional limitations due to anxiety and depression.  (R. 26).

Additionally, the ALJ acknowledged inconsistent evidence from reports by Dr. Stackhouse in August 1996 where Claimant reported a history of anxiety attacks but denied difficulty focusing, noted that she was not taking any medications for the conditions, and indicated she was able to still drive her children to activities.  (R. 26).

Claimant argues that the ALJ's omission of the reports from Dr. Mangiaricina, Dr. Branon, Dr. Gooriah and the Robert Wood Johnson Hospital are fatal to his analysis.  A review of the above documents however offers substantial evidence to support the ALJ's decision that a *severe* impairment did not exist.  First, Dr. Mangiaricina's records of Claimant's sixteen examinations from January 1996 to October 1998 only report anxiety on one visit in June 1996. (R. 318-326).  Following this time period, the prevalence of anxiety is noted in November and December of 1998 and is never reported again.  (R. 327-328).  Second, Claimant was diagnosed with panic attacks and prescribed Xanax by Dr. Branon when being treated for gastrointestinal problems.  (R. 384).  The prescription, however, for Xanax was only for one month.  (R. 384). Further, Claimant's reliance on Dr. Gooriah's diagnosis of depression secondary to a general medical condition is misplaced as the examination was performed in May 2003 years after the relevant time period.  (R. 241).  Finally, Claimants hospitalization at Robert Wood Johnson Hospital for chest pains was diagnosed as stemming from anxiety.  (R. 391).  However, the hospital records indicate that the anxiety stemmed from Claimant's daughter, her daughter's boyfriend and a recent funeral.  (R. 391).

Thus, although the ALJ did not discuss every instance where anxiety was raised in the medical documents, the record provides substantial evidence to support the ALJ's decision that Claimant's medical impairment was not severe and did not significantly limit her ability to perform basic work activities.

3.   Challenge to Step Four: ALJ's Evaluation of Claimant's
Credibility

Claimant argues that the ALJ improperly disregarded her subjective complaints of pain

and limitations as not credible in violation of SSR 96-7p in determining Claimant's residual

functioning capacity.  As part of his review, an ALJ should consider the subjective complaints of

pain even when those assertions are not fully confirmed by objective evidence.  *Smith v.

Califano*. 637 F.2d 968, 972 (3d Cir. 1981).  However, the ALJ is directed that because

symptoms, such as pain, are subjective and are difficult to quantify such evidence should only be

taken into account if it is reasonably accepted as consistent with the objective medical and other

evidence presented.  20 C.F.R. § 404.1529(3).  Specifically, the ALJ is tasked with determining

the proper weight to be given to the Claimant's complaints in light of evidence presented in the

case record.  SSR 96-7p.

Here, Claimant alleges that the ALJ discounted her subjective complaints as vague and

exaggerated without any consideration for the entire record presented.  This claim, however, is

not supported by a thorough examination of the ALJ's analysis.  First, the ALJ noted that he had

"considered all symptoms and the extent to which these symptoms can reasonably be accepted as

consistent with the objective evidence and other evidence."  (R. 23).   The ALJ then

acknowledged both the physical and mental problems Claimant identified along with the

testimony of her daily functional limitations.  (R. 27-28).  Only after considering the objective

and subjective evidence, the ALJ acknowledged that Claimant suffered some subjective

symptoms, but just not to the intensity, frequency or duration alleged.  (R. 28).

The ALJ then pointed to specific objective facts in the record which he gave greater

weight to than Claimant's subjective testimony about her pain.  (R. 28).  Specifically, the ALJ

noted that two weeks after her surgery in September 2007 she was no longer on pain medication.

(R. 28).  Further, by December, Claimant had reported to Dr. Fletcher that the surgery had

"significantly relieved the majority of her thumb pain."  (R. 28).  By April 2008, Dr. Fletcher had

authorized her to return to work with restrictions on her activities.  (R. 28).  Additionally, the

ALJ gave substantial weight to the reports and opinions of Dr. Stackhouse, Dr. McGuigan, Dr.

Levy and Dr. Carabelli which showed no nerve entrapment in her hand.  (R. 28).  Similarly,

while the ALJ recognized the Claimant's subjective mental complaints, the ALJ had previously

discounted the extent of Claimant's mental impairment due to the lack of supporting medical

evidence during the relevant time period.  (R. 20, 26, 28, 241, 318-328, 384, 391).  Hence, the

ALJ considered the Claimant's subjective testimony and provided specific reasons for

determining the credibility of Claimant's complaints supported by the record.  As such, the

ALJ's decision as to step four of the evaluation process was supported by substantial evidence.

> 4.  Challenge to Step Four: ALJ's Determination of Claimant's Residual
>     Functioning Capacity

Claimant argues that the ALJ erred in finding that she was capable of performing a light

range of work after determining her residual functioning capacity.  The ALJ determined that

Claimant had the residual functional capacity to lift and carry twenty pounds occasionally and

ten pounds frequently, and to stand or walk for six hours and to sit for six hours.  (R. 22).

However, the ALJ concluded that Claimant could not perform repetitive or prolonged pushing or

pulling with her right upper extremity or use her right thumb for repetitive handling and

fingering.  (R.22).  The ALJ found that she also had postural restrictions limiting her to no more

than frequent balancing, kneeling, crouching, stooping, and climbing of ramps or stairs, only

occasional crawling, and precluding her from climbing ladders, ropes or scaffolds.  (R. 22).

Further, the ALJ found that Claimant had an environmental limitation that restricted her from

concentrated exposure of the right hand to vibrations.  (R. 22).  Finally, the ALJ noted that

Claimant could not tolerate unusual or high stress situations.  (R. 22).  In forming each of these conclusions, the ALJ relied on medical evidence provided in the record.

Claimant's main objection to the ALJ's residual functioning capacity analysis is that it lacked a "function-by-function" assessment of abilities which includes an analysis of physical abilities, mental abilities and other abilities affected by the impairment.  The ALJ, however, did not simply provide a cursory residual functioning capacity conclusion, but went through a detailed analysis of the varying medical reports and testimony.  (R. 22-29).  In assessing Claimant's physical abilities, the ALJ stated that he assigned substantial weight to the reports of her treating physician Dr. Fletcher in addition to the reports of Dr. Stackhouse and the results of EMG/nerve conduction studies by Dr. McGuigan, Dr. Levy, and Dr. Carabelli.  (R. 28).  In August 1996, Dr. Stackhouse diagnosed Claimant with right hand pain, but noted that Claimant was not taking pain medication, X-rays of the hand reported no abnormalities, and neurodiagnostic studies were normal without evidence of carpal tunnel syndrome or nerve entrapment.  (R. 24, 179-183).  In April 1997, Dr. Fletcher evaluated Claimant for right thumb and arm pain and reported that the motor examination was grossly intact.  (R. 24, 200-204).  After surgery in September 1997, Dr. Fletcher noted in November and December that Claimant reported no pain at the base of her thumb and that pain medication was no longer needed.  (R. 24, 194-198).  In April 1998, Dr. Fletcher authorized plaintiff to return to work at a limited capacity without repetitive gripping or grasping, writing or lifting greater than five pounds with the right hand.  (R. 25, 192).  In July 1998, after conducting an EMG, Dr. Carabelli reported that only mild and chronic bilateral L4 radiculopathy existed and no peripheral nerve entrapment was prevalent.  (R. 28, 397).  Based on this medical evidence, ALJ was able to conclude that Claimant is limited in her right hand to lifting only five pounds.  (R. 25).  However, the ALJ

concluded that there were no reports in the relevant time period of complications with Claimant's left hand which would permit her to perform bilateral lifting and carrying at least at a light exertional level.  (R. 25).

Further, the ALJ recognized that the record reflected a history on non-insulin dependent diabetes mellitus, asthma, anxiety and gastroesophageal reflux disease.  (R. 24).  In particular, the ALJ's conclusion that Claimant cannot tolerate unusual or high stress situations reflects the recognition that some anxiety existed although not to the extent alleged.  (R.22).  As such, the ALJ reviewed all relevant evidence from the time period of July 15, 1997 through June 30, 1999 pertaining to Claimant's functional limitations provided in the record.  Therefore, there is substantial evidence in the record to support the ALJ's conclusion that Claimant can perform a reduced range of light work.

### 5.   Challenge to Step Five: ALJ's Reliance on Vocational Expert

Claimant argues that the ALJ inappropriately relied on the vocational expert's testimony in concluding that she was able to perform jobs that existed in significant numbers in the national economy.  Based on the testimony of the vocational expert, the information contained in the Dictionary of Occupational Titles, and considering Claimant's age, work experience, skill and residual functional capacity, the ALJ found that Claimant through the date last insured was capable of performing light or sedentary work such as a protective clothing issuer, counter clerk, call out operator or a surveillance system monitor.  (R. 30).  The chief complaint from the Claimant is that the ALJ and vocational expert failed to take into account Claimant's individual reaction to the stress of such jobs.  Claimant argues that simply because Claimant cannot perform a "high" stress job does not necessarily give her the ability to perform a "low" stress job.

In this case, the ALJ properly incorporated the vocational experts testimony into his decision that there did exist in the economy light sedentary work for the Claimant.  The ALJ specifically asked the vocational expert in making his recommendation to consider Claimant's age, education, work experience and residual functional capacity.  (R. 747-750).  In formulating his questions to the vocational expert, the ALJ highlighted Claimants physical and mental impairments.  (R. 747-750).  While the ALJ had previously found Claimant's mental impairment to be mild and non-severe, the ALJ specifically asked the vocational expert to consider "a worker who has difficulty tolerating stress."  (R. 749).  The vocational expert after taking into consideration all factors provided the ALJ with his recommendation which included positions in the national economy which could adequately accommodate Claimant's impairments.  Since the vocation expert considered the physical and stress demands of the positions proposed, the ALJ did not err in relying on the vocational expert's recommendation.

V.    **CONCLUSION**

For the foregoing reasons, the Court concludes that substantial evidence supports the ALJ's decision denying Claimant's request for disability benefits and affirms the Commissioner's final decision.  An appropriate Order accompanies this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.


Dated: December 29, 2009